BEN R. STRAUSS, D. D. DENHAM, C. R. OZIAS and ELLA M. MELLIER, Appellants, v. J. C. NICHOLS LAND COMPANY, J. C. NICHOLS INVESTMENT COMPANY, ROBERT V. AYCOCK, J. L. SHOUSE, FRANK HOWARD, H. R. WAHL, FRED L. COTTON and STANDARD OIL COMPANY OF INDIANA.—37 S. W. (2d) 505.

Division Two, March 25, 1931.

*Gossett, Ellis, Dietrich & Tyler* for appellants.

*McCune, Caldwell & Downing, Meservey, Michaels, Blackmar* and *Newkirk & Eager* for respondents.

208

WHITE, J.—The plaintiffs as owners of lots in the Wornall Homestead, an addition to Kansas City, brought this suit to set aside an agreement to extend certain building restrictions applicable to certain lots in that addition. The defendant J. C. Nichols Land Company filed the plat of the addition. The J. C. Nichols Investment Company later became interested in the property. The remaining defendants were owners of lots or parts of lots in that addition. The judgment was for defendants, and the plaintiffs appealed.

The accompanying plat shows the lots affected by the restrictions.

The plaintiff Strauss owned lot 9 in Block 12; the plaintiff Denham owned 66 feet of lot 1 in Block 12; plaintiff Ozias owned lot 11 in Block 11; plaintiff Mellier owned lot 14 in Block 11. The defendants Aycock, Shouse, Howard, Wahl, Cotton and Standard Oil Company owned lots in Blocks 11, 12 and 13. The plaintiffs and the last named defendants acquired their several lots either directly or through mesne conveyances from the Nichols Land Company. The plat of the addition contains this stipulation:

"All persons, including corporations, who now own or shall hereafter acquire any land in Block 11 and in Lots 1 to 9 inclusive of Block 12 described in this plat shall be taken and held to agree and covenant with the owner of the above described land and with its successors and assigns to conform to and observe the following restrictions, and stipulations as to the use thereof and construction of the improvements thereon for a period of 20 years, from October 9, 1912, to-wit:"

Then follow five paragraphs enumerating restrictions governing the uses to which the lots should not be put, the kind of buildings to be

erected upon them, their distance from the street, and providing among other things that the lots should not be improved, used or occupied for other than residence purposes. Then came this provision, the construction of which is the matter at issue in this case:

"That said period of 20 years during which the aforesaid covenants and restrictions shall be in force may be extended as to any or all of said covenants and restrictions for additional periods not exceeding 20 years each by the owners of a majority of front feet in Block 11 and of Lots 1 to 9, inclusive of Block 12, of said Addition prior to the expiration of the first 20 years or any subsequent 20 years executing and acknowledging an agreement or agreements in writing extending the time as to said covenants and restrictions, and filing the same of record in the office of the Recorder of Deeds of Jackson County, Missouri, at Kansas City."

The plat was filed October 9, 1912. April 15, 1924, twelve years later, an agreement to extend the time of the restrictions which the plaintiffs seek to set aside, was executed. After reciting that the restrictions on the face of the plat of the Wornall Homestead were to remain in force for twenty years from the date thereof, and that they might be renewed for additional periods of time not exceeding twenty years each, "by the owners of the majority of the front feet of said addition then restricted prior to the expiration of the first twenty years' period or of any successive twenty-year period thereafter," etc., the agreement proceeded:

"Now, Therefore, in consideration of the premises and in consideration of the sum of one dollar to each of the parties hereto paid by the other, the receipt of which is hereby acknowledged, it is hereby agreed by and between the parties hereto, who are the owners of those lots in said additions set opposite their respective names below (which lots so described, constitute a majority of the front feet of the lots in said addition, restricted by said plat and necessary for such extension) that each and every one of said restrictions set forth on the recorded plat of said blocks 11, 12, 13 and A of Wornall Homestead shall be and is hereby extended for a period of twenty years from the date of the expiration of said first twenty year period on all of the lots covered by the restrictions in said plat, and all restrictions except approval of plans, subsequently placed on lots in Block 13 are hereby renewed and extended for the same period of time."

Then followed a further stipulation that the restrictions should be automatically continued for successive periods of twenty years, which the court held was void so that it is not involved.

This agreement was signed and acknowledged by all the defendants except the Nichols Investment Company, and in addition by several others, owners of lots: by five owners of lots in 1 to 9 in Block 12; by sixteen owners of lots in Block 11; by four owners of lots in Block 13; the last including the Nichols Land Company, a cor-

poration. It is not questioned that the signers of the extension agreement were owners of a majority of the front feet of the lots in Block 11, the owners of a majority of the front feet in lots 1 to 9 in Block 12.

The plaintiffs claimed that the agreement should be set aside for two principal reasons. First: that the signers of the agreement did not come within the terms of the extension clause in the plat; second: that the signers were induced by misrepresentations of J. C. Nichols of the Nichols Investment Company to sign the agreement; that they signed it under a misapprehension of the facts.

I. The first point turns upon the construction of the extension clause in the plat to the effect that an extension for an additional period be made, "by the owners of a majority of front feet in Block 11 and of lots 1 to 9, inclusive in Block 12 of said Addition."

This clause as it appears in the record shows no punctuations except the comma after the figure 9.

Appellants assert that the expression is ambiguous; that it is susceptible of three different constructions, and therefore must be construed if it reasonably can against the restricting grantor.

First, that the extension might be exercised by the owner or owners of a majority of the aggregate front feet in all the lots in Block 11 and lots 1 to 9 in Block 12.

Second, by the owners of a majority of the front feet in Block 11 and all the owners of lots 1 to 9 in Block 12.

Third, the owner or owners of a majority of the front feet in Block 11, plus the owner or owners of a majority of the front feet in lots 1 to 9 in Block 12.

It occurs to us that if each of those several constructions is possible a fourth one would be just as reasonable; it could mean the owners of a majority of the front feet in Block 11, and the owners of a majority of the *lots* in the north half of Block 12.

Appellants contend, applying the rule that the covenant should be construed against the restricting grantor, the second one should obtain. They cannot recover unless the second construction is adopted. Manifestly the condition mentioned in either the first or third, and in the fourth suggested by us, was met by sufficient signers of the extension agreement.

The parties treat the covenant for extension set out in the plat as binding, as much so as if it had been contained in the conveyance which each of the parties in interest received. A cardinal rule for the construction of deeds is to give effect to the intention of the parties and that intention, where it is manifest, must prevail over technical rules of construction. [18 C. J. 252.] The intention must be gath-

ered from the language used in the instrument. In this connection it may be said that the rule which requires ambiguous provisions to be construed against the grantor, is available only when all other rules fail. [Biddle v. Vandeventer, 26 Mo. 500, l. c. 503; Ohlson v. Batterton, 230 S. W. l. c. 113; Bernero v. Real Estate Co., 134 Mo. App. 290, l. c. 298; 8 R. C. L. p. 1094.]

Another principle applicable here is that the rule requiring a construction most strongly against the grantor is not applicable where parties claim under the same deed. [2 Devlin on Deeds, sec. 848, p. 1561; 18 C. J. 264.] Here the defendants affected who signed the restriction obtained their deeds from the same source as the plaintiffs obtained theirs; they all claim under the J. C. Nichols Land Company and all are equally bound by the restrictive covenants set forth in the plat.

It does not appear whether these defendants who signed the extension agreement and are affected by the result of this suit obtained their deed before or after the plaintiffs obtained their deeds. The rule of strongest construction against the grantor would apply only to the J. C. Nichols Land Company.

The defendants Standard Oil Company and J. C. Nichols Land Company and J. C. Nichols Investment Company did not own any lots or parts of lots involved in the restricted area. They were not necessary parties to the contract of extension. Some of the other signers of the extension were in the same condition and were not made parties defendant, while several signers affected by it were not made parties; but there is no complaint of defect of parties defendant. The remaining defendants owned lots affected by the extension as did the plaintiffs. They are, therefore, in the same boat with the plaintiffs, having derived their titles from the same source, and affected in like manner by the covenants in the plat.

II. Appellants cite several cases construing restrictive covenants similar to those set out in the plat of Wornall Homestead. They are ▮▮▮▮▮▮ not in point here. One thing overlooked by appellants is that we are not called upon to construe any of the restrictive covenants. There is no dispute as to what each and every one of the restrictions means, or to what subjects it applies. What we have to consider here is the construction of the covenant giving certain persons authority to extend the restrictions. In effect it is a power.

Building restrictions have been defined as covenants which create an easement running with the land in each and every deed containing the restrictions. It is appurtenant to each lot and it is a property right. [18 C. J. 394; Peters v. Buckner, 288 Mo. l. c. 631; Conrad v. Boogher, 201 Mo. App. 657; Milligan v. Balson, 214 Mo. App. 641;

King v. Union Trust Co., 226 Mo. 1. c. 365.] The covenant that the majority might extend the duration of the easement was a power vested in certain persons affected by it. [49 C. J. 1248-1249.] Under the principle stated above a construction of the covenant which authorizes such an extension is governed by general rules relating to such covenants. The intention of the parties, the plain and ordinary use of the language employed, and any surroundings which would throw light upon the purpose intended, must guide us in such construction.

To hold against appellants it is not necessary for us to decide that the covenant is unambiguous. It is sufficient if we conclude that appellants' construction cannot be adopted without doing violence to the language used.

III. We may first inquire whether the covenant is in fact ambiguous. The restrictions may be extended for additional periods not exceeding twenty years each:

"By the owners of a majority of front feet in Block 11 and of lots 1 to 9, inclusive in Block 12."

Appellants would construe that language so that it should read as follows:

"By the owners of a majority of front feet in Block 11 and by all the owners of lots (or by the owners of all the lots) 1 to 9 inclusive in Block 12."

They would have us understand missing words which mean that.

If words must be understood after "and" and before "of lots 1 to 9, inclusive," naturally and grammatically it must be words similar in significance to those used in the preceding phrase. "Majority" must be understood; whether it is "owners of lots" or "owners of front feet" is immaterial, so far as it may affect the result.

If the word "of" before the word "lots" was omitted, there could be no possible doubt about the meaning. It would simply read: By the owners of a majority of the front feet in Block 11 and lots 1 to 9 in Block 12.

Thus the lots in Block 12 and in Block 11 would be linked together by the conjunction "and" in the same connection and with the same effect, it would be the owners of a majority of the total front feet in both blocks. The interpolation of the word "of" before "lots" apparently is what leads to the conclusion contended for by appellant, since every word in a covenant of that kind must be given significance. What is the significance of that word "of?" First is the phrase "owners of a majority of front feet in Block 11," and then any words understood following the word "of" occurring later in the

same sentence would mean individuals in the same character and connection. That is the construction contended for by respondents; that it requires a majority of the owners of front feet of Block 11, and a majority of owners of front feet in lots 1 to 9 in Block 12. The agreement of extension would meet that interpretation. It is evident that the Nichols Land Company in filing the plat considered the ownership of front feet as measuring the authority to exercise the power expressed in the covenant. And if it had been the intention to have the effect contended for by appellants the stipulation would have read "and the owners of *all* the front feet in lots 1 to 9" or owners of *all* the lots 1 to 9 in Block 12.

Those who are bound by the restrictions are thus described in the plat:

"All persons, including corporations, who now own or shall hereafter acquire any land in Block 11 and in lots 1 to 9 inclusive of Block 12 described in this plat shall be taken and held to agree and covenant with the owner of the above described land and with its successors and assigns to conform to and observe the following restrictions and stipulations. . . ."

That can mean nothing else than that all persons included in that designation of owners stand on the same footing, equally bound and equally affected. The mention of such owners in the covenant authorizing an extension would necessarily mean owners in like situation and under like obligation. If equally bound and equally affected, naturally they should have equal authority and equal power to modify, abrogate or extend the restrictions.

There is no reason why owners of lots in Block 12 should have greater authority than the owners of lots in Block 11. They are on opposite sides of the same street, they are affected in exactly the same way, they were mentioned in the same way in the plat, and on the face of it were given exactly the same authority in the covenant relating to extensions. On the theory of appellant one owner of a single lot or a small part of a lot in the north half of Block 12 could defeat the wishes of all the other owners of property in both blocks. It is not in accord with common justice and the apparent intention of the party who filed the plat to give it such effect. It is unreasonable to suppose that any one who purchased lots because of those restrictive covenants making the area one devoted to residences only would have purchased if he had known that the effect of the restrictions or the extension of the restrictions could be completely blocked by the owner of property that amounted to little or nothing on the north side of Block 12. We think that it could not in reason be given that construction.

IV. There is nothing in the surroundings which compel a different construction of the covenant vesting power in a majority of

front feet owners to extend the restrictions. The south half of Block 12 at the time of the trial was vacant and always had been vacant. It formerly had been marked "reserved for business." There were no restrictions in Block 13 across Brookshire Boulevard from Blocks 11 and 12. Appellants argue that all those in the north half of Block 12, because their property adjoined in the rear the unrestricted lots facing Sixty-third Street, being close to the place where business might be conducted, would not desire an extension of the restrictions as might those in Block 11. The exclusion of the south half of Block 12, and all of Block 13, from the restricted area in that addition was the same when the owners of the north half of Block 12 acquired their property as it was at the time of the extension, and the same reason for that unrestricted area which existed at that time existed at the time the plat was laid out. The plaintiff Strauss whose lot was at the intersection of Brookshire Boulevard and Sixty-second Street Terrace cannot be considered to have any greater right to establish a business on his lot than has his neighbor across the street, or any other neighbor on the same side of the street. The maintenance of an objectionable business on his lot would injuriously affect the people across the street in Block 11 in the same way as the maintenance of one across the street in Block 11 would affect him and his lot as a residence lot. The fact that Strauss or any other owner of a lot on the north half of Block 12 would possess an advantage over those in Block 11 by having the restrictions expire is not a reason for an interpretation which would give them greater authority to prevent their extension. The very purpose of the restrictions was to prevent one owner from using his lot to his advantage and in a way hurtful to the other property in the restricted area. When the parties affected by the extension originally bought their lots they bought them with full, constructive notice of the restrictions and of the covenant authorizing an extension. They knew exactly where the unrestricted areas were. If the proximity of business lots was a disadvantage to the plaintiff they knew they would suffer that disadvantage as soon as business houses were erected on the south side of Block 12. They understood it when they bought their lots and they suffered no additional disadvantage when this extension was made.

V. It appears that J. C. Nichols was president and manager of the Nichols Land Company and manager also of the Nichols Investment Company. The Nichols Land Company was interested in the development of large tracts in that neighborhood called the Country Club District. A number of additions were affected, and in laying out the different additions in that territory building restrictions similar to those under consideration accompanied them.

It was all a part of one general plan and scheme to have restricted areas devoted to residences only and different parts of the territory unrestricted.

It was alleged in the petition that Nichols and others by "blandishments, undue influence and false representations" procured the signatures to the extension agreement. It appears that a meeting was held, with a hundred, perhaps two hundred persons present, at which these "blandishments" were spread over his hearers by Mr. Nichols to induce signatures to the extension agreement. Several witnesses for the plaintiff testified that they gathered from what was said by Mr. Nichols and Mr. Grant, who was perhaps one of his agents, that the restrictions in the addition under consideration would expire within the year, or that it was necessary to extend them before the end of the year. Some of the signers testified that they would not have signed if they had known that they had more time in which to make the extension. The defendant introduced several witnesses who testified positively that Mr. Nichols at the meeting did not say that it was necessary that the restrictions on the property affected had to be extended within that year. None of the plaintiffs' witnesses testified that Nichols said the restrictions would expire by the end of the year. In fact, every one was charged with notice that the restrictions would not expire for about eight years, since the plat was filed in 1912 and this meeting was held in 1924. Plaintiffs' witnesses merely testified to an impression that the restriction had to be extended at once. Mr. Nichols himself testified that he had had previous meetings with committees from the different tracts in the Country Club District and discussed the advisability of extending the restrictions. Restrictions on the several tracts would run out at different times, some of them soon and some of them extending as long as thirteen years. Mr. Nichols testified that he so explained to the meeting; that in order to bring the owners of property throughout the Country Club District into harmony with the general scheme of extending the restrictions it was important that they should act together. The inference was that those owning the property where the restrictions soon would expire would be more willing to sign an extension if others owning property where the restrictions would expire later would agree to the extension. An extension of restrictions on the Wornall Homestead Addition was only a part of the general scheme. The evidence does not justify the claim that any one person at the meeting was misled as to any specific fact. One witness who signed the extension said only that he would have waited a while if he had known that the restrictions had eight years to run. He was, however, in favor of extending the restrictions.

The plaintiff Strauss complained that he didn't know anything about it; he was in New York at the time. He has no reason to com-

plain on that account. There was nothing to show that the meeting was held intentionally in his absence, or that there was any reason for his absence at the time the extension project came up, except that his own business drew him away. The covenant to extend would have no effect if it were absolutely necessary to have every one present when the extension agreement was signed. It was only necessary that the majority specified in the covenant would sign with understanding of the purpose and effect of the extension. The weight of the evidence supports the conclusion of the trial court that there was no undue influence or improper methods referred to, to induce the signing of an extension agreement.

The judgment accordingly is affirmed. All concur.